IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-11436

_____

D.C. Docket No. 1:12-cv-20123-MGC


HUMANA MEDICAL PLAN, INC.,

                                        Plaintiff - Appellee,

versus


WESTERN HERITAGE INSURANCE COMPANY,

                                        Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

Before ED CARNES, Chief Judge, TJOFLAT, HULL[*], MARCUS, WILSON, WILLIAM PRYOR, MARTIN, JORDAN, ROSENBAUM, JILL PRYOR, and NEWSOM, Circuit Judges.[**]

---

[*] Judge Frank Hull participated in the en banc poll that was conducted in this case before taking senior status on December 31, 2017.

[**] Judge Julie Carnes recused herself and did not participate in the en banc poll.

BY THE COURT:

A member of this Court in active service having requested a poll on whether this case should be reheard by the Court sitting en banc, and a majority of the judges in active service on this Court having voted against granting a rehearing en banc, it is ORDERED that this case will not be reheard en banc.

TJOFLAT, Circuit Judge, dissenting:

This case was brought by Humana Medical Plan, Inc., a medical insurer, against Western Heritage Insurance Company, the liability insurer of an alleged tortfeasor, to recover the sums Humana paid for the treatment of the injuries its insured, Mary Reale, sustained due to the tortfeasor's negligent act.

Under the scenario presented by this case—a common one in insurance litigation—the medical insurer is a subrogee of its insured's tort claim to the extent of the sums it paid for the insured's treatment.[1]  Under the common law and/or state statutory laws that codify the common law, if the insured establishes the tortfeasor's liability and the tortfeasor has a liability insurance policy that covers such liability, the medical insurer has a right to reimbursement of any expenses it paid on behalf of the insured that were included in the insured's recovery.  This reflects the basic principle of indemnification behind all sorts of insurance agreements.  *See* 13 Jeffrey E. Thomas & Francis J. Mootz, III, *New Appleman on Insurance Law Library Edition* § 158.02 (2017) ("Although an insurer is

---

[1] At common law, a medical insurer's entitlement to the proceeds of the insured's tort claim is derivative of the medical provider's lien on the proceeds of the insured's recovery representing the insured's medical expenses.  The medical provider treats the patient in exchange for the patient's obligation to pay the provider for the treatment rendered.  The medical provider obtains subrogation rights as collateral to secure the patient's debt.  If the patient sues a tortfeasor for his injuries, the patient gives the medical provider a lien on the portion of the patient's recovery paid by the provider.  Equitable principles give rise to this lien.  *See infra* n.8 and accompanying text.

Now assume a medical insurer gets involved and pays the medical provider.  At the point at which the insurer pays the provider for the treatment it provided to the insured, the insurer acquires the provider's lien on the insured's recovery for his medical expenses (but not the provider's claim against the patient for payment).

responsible for making payment, the wrongdoer is thought to be socially responsible. Placing the ultimate responsibility on the party who committed the breach or tort promotes social justice."). This right to recovery also prevents unjust enrichment: without the reimbursement right, the insured would enjoy a double recovery.

In this case, Reale sued the alleged tortfeasor in state court. The case settled without an admission of liability by the tortfeasor. Reale released her claim against the tortfeasor and Western, as the tortfeasor's liability insurer, for an amount that included the sums Humana, her medical insurer, had expended on her behalf. The state court, applying state law, honored Humana's right to reimbursement but awarded Humana only a portion of the sums it paid on Reale's behalf. Unsatisfied with the award, Humana filed the lawsuit now before this Court, seeking further reimbursement from Western under federal law. Humana's complaint alleged that an act of Congress entitled it to recover from Western *twice* the amount it had expended for Reale's treatment, notwithstanding (i) that Reale had released her claim against Western when she settled her case against the tortfeasor (without the tortfeasor's admission of liability); and (ii) that Western,

4

having remitted the proceeds of the settlement, was rendered immune from suit under state law.[2]

Is it possible that Congress provided Humana, and other medical insurers similarly situated, such an entitlement?  Humana says yes, in the Medicare Secondary Payer Act ("MSP Act").  Humana, as a Medicare Advantage Organization ("MAO"), contracts with Medicare insureds to provide them with Medicare and other benefits.  In the scenario portrayed above, because Humana did not receive full reimbursement from the proceeds of Reale's settlement, the MSP Act, according to Humana, provided it with a cause of action against Western for twice the amount it paid for Reale's medical care and treatment.  All Humana had to do to recover that amount was establish the tortfeasor's liability for Reale's injuries and that Western covered that liability.  Reale's settlement with Western established that.  This notwithstanding that the tortfeasor and Western had settled Reale's claim without admitting fault and that Reale—by releasing her claim against them—effectively exonerated them of all state-law liability.

The District Court accepted Humana's interpretation of the MSP Act, and therefore concluded that MAOs like Humana have a cause of action against

---

[2] As indicated in note 1, *supra*, Humana paid Reale's medical providers and received in exchange those providers' liens on Reale's recovery from Western.  In suing Western, Humana was not seeking to enforce the liens it acquired from Reale's medical providers.  Rather, Humana sought to cash in on an entitlement to full reimbursement it allegedly received under federal law.  That entitlement, according to Humana, came to fruition once Western settled with Reale, compensated her for her medical expenses, and refused to reimburse Humana for those expenses thereafter.

5

liability insurers like Western for damages in double the amount of their reimbursement claims. *Humana Med. Plan, Inc. v. W. Heritage Ins. Co.*, 94 F. Supp. 3d 1285 (S.D. Fla. 2015). The District Court reached this conclusion without discussing the displacing effect its holding would have on state subrogation laws in this Circuit. Nor did the Court appear concerned that its holding would nullify totally the release Reale gave the tortfeasor and Western. Western appealed, and a divided panel of this Court affirmed. *Humana Med. Plan, Inc. v. W. Heritage Ins. Co.*, 832 F.3d 1229 (11th Cir. 2016).[3]

This Court has voted to deny rehearing en banc. I dissent. The statutory right of action cited by Humana, the District Court, and the panel majority was not intended to protect MAOs. The policy reasons behind the right of action differ starkly from those which motivated the creation of the Medicare Advantage program. Moreover, the statutory text of the right of action never references Medicare Advantage insurers at all. Nor could it: the right of action predated the Medicare Advantage program, and the statute that codified Medicare Advantage insurers' common law subrogation rights, by seventeen years.

Below, I begin my discussion of the case at hand with an overview of Medicare's statutory scheme, followed by an explanation of how Medicare

---

[3] In affirming the District Court's judgment, the panel agreed with the Third Circuit's decision in *In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, which also concluded that the MSP Act affords MAOs a federal right to sue liability insurers for double damages. 685 F.3d 353, 367 (3d Cir. 2012).

Advantage works.  I then explain why transmuting the private right of action meant for the traditional Medicare scheme into the Medicare Advantage setting defies the plain statutory text and ignores the policy reasons behind traditional Medicare and Medicare Advantage, respectively.  Finally, I show how the Court's decision destroys the state-law framework that already exists to protect the subrogation rights of private insurers, like MAOs, and significantly frustrates the long-established public-policy goal of favoring compromise and settlement of civil claims in place of expensive, and here duplicative, litigation.  Under the Court's holding, these results are the heavy price paid to afford MAOs a strict right to recover double their outlays from nonpaying liability insurers.

I.

A. *Traditional Medicare*

Under the traditional Medicare framework, the Government acts as the health insurer, so it pays medical expenses directly out of the public fisc.  Ctrs. for Medicare & Medicaid Servs., *How Is Medicare Funded?*, Medicare.gov (last visited Jan. 12, 2018), https://www.medicare.gov/about-us/how-medicare-is-funded/medicare-funding.html.  In 1980, Congress enacted the MSP Act to protect the Medicare Trust Funds and rein in Medicare costs, which at that time were vastly exceeding actuarial projections.  5 James B. Wadley, *West's Federal Administrative Practice* § 6305 (2017).  To accomplish this purpose, the Act, 42

U.S.C. § 1395y, gave the Government rights similar to the subrogation rights of private insurers under state law when the Government pays medical expenses on behalf of a beneficiary injured by a tortfeasor (or, put differently, acts as a "secondary payer"). The Act states that when Medicare compensates a beneficiary's covered medical expenses and another insurer—like a tortfeasor's liability insurer—also covers those expenses, then Medicare must condition its payment on reimbursement by that insurer (the primary payer), which must reimburse the Government within sixty days of receiving notice that it is responsible for the monies paid by the Government. *See id.* § 1395y(b)(2)(B)(i)–(ii). Thus, as with private insurers under state law, in a case in which both Medicare (acting as a person's health insurer) and a tortfeasor's liability insurer cover the same medical expenses, this has the effect of making Medicare an insurer of last resort.

Yet the MSP Act affords the Government even stronger reimbursement rights than private insurers possess under state law. There, a secondary payer can seek reimbursement from an insured who received payment from a tortfeasor's liability insurer. Under the MSP Act, however, the Government can seek reimbursement from the beneficiary who has been compensated *or* from the tortfeasor's liability insurer directly. And this recovery right is not disturbed by any payments the liability insurer might have made already: the Government can recover its outlays

8

from the liability insurer even though the insurer has already paid those outlays to the beneficiary in satisfaction of a settlement or judgment. *See id.* § 1395y(b)(2)(B)(ii) ("[A] primary plan, and an entity that receives payment from a primary plan, shall reimburse the appropriate Trust Fund for any payment made by the [Government] under this subchapter with respect to an item or service if it is demonstrated that such primary plan has *or had* a responsibility to make payment with respect to such item or service." (emphasis added)).  Stated differently, a beneficiary's release of a liability insurer does not extinguish the liability insurer's obligation, as a primary payer, to reimburse the Government.  The Government does not occupy the status of a subrogee of part of the beneficiary's claim against the tortfeasor; it has reimbursement rights as against the tortfeasor's liability insurer that are *independent* of the insured's right of action for recovery under tort law.

## 1. *The Government Right of Action*

To enforce this right, Congress created a right of action whereby the Government can seek double damages from a primary payer who has failed to reimburse the funds it owes in a timely fashion. *See id.* § 1395y(b)(2)(B)(iii).  The right of action is triggered when the primary payer's responsibility to reimburse the Government has been demonstrated by a judgment, settlement payment, or "by other means." *Id.* § 1395y(b)(2)(B)(ii).

9

## 2. *The Private Right of Action*

In addition to the reimbursement right it provided the Government in the MSP Act, Congress also gave individuals who receive Medicare benefits a right to sue primary payers who fail to pay or reimburse the expenses for which they are responsible.  That right of action, 42 U.S.C. § 1395y(b)(3)(A), states:

> There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with [the MSP Act].

A beneficiary can invoke this right of action whenever a primary payer fails to live up to its responsibilities under the MSP Act, regardless of whether Medicare has chosen to make a conditional payment of medical expenses on behalf of the beneficiary.  *See Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 527 (8th Cir. 2007) ("Congress contemplated that Medicare beneficiaries could recover double damages to vindicate their private rights when their primary payers fail to live up to their obligations, even if Medicare has made a conditional payment of the beneficiaries' expenses.").  This is so because Medicare's secondary payment on behalf of the beneficiary does not completely release the beneficiary of her responsibility to pay her providers for her treatment.  *See id.* at 526 ("Congress must have intended that a Medicare beneficiary could sue its primary insurer for expenses Medicare had already paid. . . . The idea that Congress expected the beneficiary to be able to sue to vindicate his or her own contractual and tort

10

interests is bolstered by the fact that the beneficiary's expenses will have only been paid 'conditionally' by Medicare, which leaves the beneficiary with less than a final settlement of his or her liability to the health-care providers." (citation omitted)).

In conjunction with the Government right of action, this right of action authorizes what is at bottom a debt-collection proceeding. A primary payer must reimburse the Government once it receives notice that the Government is a secondary payer, e.g., that Medicare made a payment of the beneficiary's medical expenses conditioned on reimbursement. 42 U.S.C. § 1395y(b)(2)(B)(ii). A judgment against the tortfeasor or a settlement agreement between the tortfeasor's liability insurer and the beneficiary triggers this responsibility. *Id.* Once the judgment is entered or settlement agreement is executed, the Government will demand reimbursement. If the primary payer rejects the demand, either the Government or the beneficiary can sue the primary payer for double the amount owed by the primary payer. Either can do so regardless of whether the primary payer has paid the settlement or judgment to the beneficiary, because the Government's right of reimbursement is distinct and independent from the beneficiary's right to recover his medical expenses in tort.

In this case, however, the question is whether an MAO, a private insurer, has the same independent right of reimbursement under the Medicare Advantage

11

program as does the Government under traditional Medicare.  If it does, the MAO can recover double damages from the primary payer once the primary payer's liability is established through settlement with the Medicare beneficiary or the satisfaction of a judgment for the beneficiary and the primary payer refuses to pay. The MAO can recover double damages even though the primary payer has already paid the MAO's outlays to the Medicare beneficiary.  Under this reading of the private right of action, the primary payer must pay the MAO's outlays twice: once to the beneficiary to obtain a release or a satisfaction of judgment and once to the MAO to satisfy the MAO's reimbursement right.  This is a question of first impression.  Before answering that question, however, we must first consider how Medicare Advantage functions in comparison to traditional Medicare.

## B. *Medicare Advantage*

Congress created Medicare Advantage to "utilize innovations that have helped the private market contain costs and expand health care delivery options." H.R. Rep. No. 105-217, at 585 (1997) (Conf. Rep.), *reprinted in* 1997 U.S.C.C.A.N. 205–06.  Under Medicare Advantage, private insurers contract with the Government, namely the Center for Medicare Services ("CMS"), to provide Medicare benefits to eligible individuals.  U.S. Gov't Accountability Off., GAO-14-417T, *Medicare: Contractors and Private Plans Play a Major Role in Administering Benefits* 6 (2014).  MAOs may also provide additional coverage of

12

medical services not covered by Medicare.  *Id.*  CMS pays each MAO a fixed monthly payment, which is adjusted for insureds' health status and demographics, for each person enrolled in the MAO's plan.  *Id.*  MAOs are then left to manage those funds (along with the premiums, if any, they charge insureds to provide additional benefits not covered by Medicare) independently and can even include additional benefits, so long as their members receive all the Medicare benefits to which they are entitled.  *See* 42 U.S.C. § 1395w-22(a)(1)–(3).  Thus, once it has received its fixed allotment from CMS, an MAO pays any covered medical expenses out of its own funds, not the Medicare Trust Funds.

This system is much different from traditional Medicare, where providers administer Medicare benefits and seek reimbursement directly from the Government for each individual medical service or procedure performed by physicians.  Because MAOs receive a fixed amount of money from the Government and are left with discretion to manage those funds on their own as long as they provide their insureds with full Medicare benefits, MAOs accept the risk of loss if the subsidies they receive from the Government and any additional premiums they might charge for additional benefits are not enough to pay for all of those benefits.  At the same time, however, MAOs stand to gain if their business practices and innovations save costs such that they can provide their insureds with full benefits at an operating cost lower than the amount they get from the

13

Government.  In this way, the Government's per capita payments incentivize the private market innovations that motivated Congress's creation of the Medicare Advantage program.

## II.

Like Judge William Pryor, whose incisive dissent from the Court's opinion I echo and build upon, I disagree with the Court's construction of the private right of action.  As Judge Pryor discusses aptly, this case should begin and end with the statutory text, which clearly excludes MAOs from the private right of action.  *See Humana*, 832 F.3d at 1243 (Pryor, J., dissenting).  Even if the text were not enough, the divergent policies underlying the MSP Act and the Medicare Advantage program confirm this conclusion.  And to add icing on a cake already frosted, the panel majority's construction exterminates the state-law background that already protected private insurers like MAOs and substitutes in its place a scheme that is at once nonsensical and punitive.  I discuss each of these points in turn.

## A.

I begin with the MSP Act's text.  Our task is to "interpret the relevant words [of a statute] not in a vacuum, but with reference to the statutory context." *Torres v. Lynch*, 578 U.S. ____, 136 S. Ct. 1619, 1626 (2016).  As Judge Pryor notes, the scope of the private right of action, 42 U.S.C. § 1395y(b)(3)(A), is limited by its

14

references to paragraphs (1) and (2)(A) of § 1395y(b), the MSP Act's secondary payment provision. *Humana*, 832 F.3d at 1240–41 (Pryor, J., dissenting). Paragraph (1) generally prohibits primary plans from denying benefits on the ground that an individual is eligible for Medicare Part A. *See* 42 U.S.C. § 1395y(b)(1). That provision has no bearing in this appeal. Paragraph (2)(A) addresses only payment by the *Government* out of the *Government's* coffers.[4] It

---

[4] The full text of Paragraph (2) reads:

(2) Medicare secondary payer

(A) In general

Payment under this subchapter may not be made, except as provided in subparagraph (B), with respect to any item or service to the extent that–

(i) payment has been made, or can reasonably be expected to be made, with respect to the item or service as required under paragraph (1), or

(ii) payment has been made or can reasonably be expected to be made under a workmen's compensation law or plan of the United States or a State or under an automobile or liability insurance policy or plan (including a self-insured plan) or under no fault insurance.

In this subsection, the term "primary plan" means a group health plan or large group health plan, to the extent that clause (i) applies, and a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance, to the extent that clause (ii) applies. An entity that engages in a business, trade, or profession shall be deemed to have a self-insured plan if it carries its own risk (whether by a failure to obtain insurance, or otherwise) in whole or in part.

(B) Conditional payment

(i) Authority to make conditional payment

The Secretary may make payment under this subchapter with respect to an item or service if a primary plan described in subparagraph (A)(ii) has not made or cannot

15

does so by referencing subparagraph (B), which refers repeatedly and exclusively to the Secretary of Health and Human Services and the Medicare Trust Funds: "[t]he *Secretary* may make payment," "[a]ny such payment by *the Secretary* shall be conditioned on reimbursement to the appropriate *Trust Fund*," "an entity that receives payment from a primary plan[] shall reimburse the appropriate *Trust Fund* for any payment made by *the Secretary*," and "[i]f reimbursement is not made to the appropriate *Trust Fund . . . the Secretary* may charge interest." *Id.* § 1395y(b)(2)(B)(ii) (emphasis added). An MAO is not the Secretary of Health and Human Services, and it does not make payments out of the Medicare Trust Funds. It is a private actor paying claims out of private funds. As a result, this should be

reasonably be expected to make payment with respect to such item or service promptly (as determined in accordance with regulations). Any such payment by the Secretary shall be conditioned on reimbursement to the appropriate Trust Fund in accordance with the succeeding provisions of this subsection.

(ii) Repayment required

Subject to paragraph (9), a primary plan, and an entity that receives payment from a primary plan, shall reimburse the appropriate Trust Fund for any payment made by the Secretary under this subchapter with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service. A primary plan's responsibility for such payment may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means. If reimbursement is not made to the appropriate Trust Fund before the expiration of the 60-day period that begins on the date notice of, or information related to, a primary plan's responsibility for such payment or other information is received, the Secretary may charge interest (beginning with the date on which the notice or other information is received) on the amount of the reimbursement until reimbursement is made (at a rate determined by the Secretary in accordance with regulations of the Secretary of the Treasury applicable to charges for late payments).

the end of the matter: when an MAO seeks reimbursement from a liability insurer and the liability insurer fails to pay, the liability insurer has not "fail[ed] to provide for primary payment (or appropriate reimbursement) *in accordance with paragraphs (1) and (2)(A)*." *Id.* § 1395(b)(3)(A) (emphasis added).

## B.

Moving beyond the plain text, further contextual analysis confirms that MAOs cannot recover under the private right of action. At the time Congress enacted the MSP Act, all Medicare plans operated in the traditional Medicare environment. In that setting, when the Government acts as a secondary payer, it pays a specific amount for a specific service. And, most importantly, it pays directly out of its own coffers—namely, the Medicare Trust Funds.

Not surprisingly then, the Government is prohibited generally from paying claims for which primary payers are responsible. The only exception is when a primary payer "has not made or cannot reasonably be expected to make payment . . . promptly." *Id.* § 1395y(b)(2)(B)(i). In such a case, the Government has discretion to pay the claim, so long as it conditions its payment on reimbursement by the primary payer. *Id.* Thus, this exception allows the Government to balance its need to protect the public fisc with the financial needs of the harmed Medicare beneficiary in need of benefits.

Of course, when the Government does elect to pay expenses before a

17

primary payer does so, it must assume the risk that the primary payer will delay or avoid repayment of the public's funds. What's more, if a primary payer fails to pay the Government back, the Government must employ a cumbersome debt-recovery procedure to seek the funds it is owed. If the primary payer fails to reimburse the Government within sixty days of receiving notice of its responsibility to do so, the Secretary of Health and Human Services may begin to charge interest. *Id.* § 1395y(b)(2)(B)(ii). After 180 days, the Secretary then refers the interest-accruing debt to the Department of the Treasury, which attempts to collect it. 31 U.S.C. § 3711(g)(1)(A)–(B). If the Treasury Department's debt-collection efforts fail, it refers the debt either back to CMS or to the Department of Justice for litigation. *Id.* § 3711(g)(4)(A), (C). If, at this point, the Government chooses to litigate against the delinquent primary payer, then it may seek double damages. 42 U.S.C. § 1395y(b)(2)(B)(iii).

In contrast, in the Medicare Advantage context, the Government simply pays MAOs a fixed, per capita payment and leaves it to the MAOs to pay their insureds' expenses as they arise. That fixed payment is set before the Government contracts with an MAO to provide coverage. This arrangement gives MAOs more flexibility to manage benefits administration as they see fit (so long as they provide the same benefits that the Government provides to beneficiaries in traditional Medicare). But this also creates more risk for MAOs as compared to traditional Medicare

18

providers: because CMS payments to MAOs are fixed, MAOs bear the risk that plan expenditures will exceed plan revenues. Of course, risk is a two-way street, so when revenues exceed expenditures, MAOs keep the resulting profit.[5]

Under this arrangement, when MAOs pay claims, they draw upon their own coffers rather than the Medicare Trust Funds. Thus, when a manager of an MAO decides whether to make a secondary payment out of her organization's funds, she is guided by a desire to maximize shareholder profits. Hence, MAOs agree, at the time of contracting with CMS, to bear the risk of loss if the Government's rate is too low to cover their insureds' expenses. This has the effect of shifting the risk of loss away from the Government and toward the MAO.

MAOs also have greater flexibility with regard to seeking reimbursement of their secondary payments. If an MAO chooses to issue a secondary payment pursuant to the exception in § 1395y(b)(2)(B)(i), federal law simply says that it "*may* . . . charge" the primary payer thereafter.[6] *Id.* § 1395w-22(a)(4)(A) (emphasis added).[7] Secondary-payment-recovery methods also differ greatly as

---

[5] MAO profits are restrained by the requirement that MAOs must use at least 85 percent of their total revenue to pay for incurred claims and activities that improve health-care quality. 42 U.S.C. § 1395w-27(e)(4); 42 C.F.R. § 422.2420(b)(1).

[6] Contrast that optional language with the mandatory language used in the traditional Medicare environment when Medicare is the secondary payer and Medicare Trust Fund money is at stake: "Any [secondary] payment by the Secretary *shall be* conditioned on reimbursement to the appropriate Trust Fund." 42 U.S.C. § 1395y(b)(2)(B)(i) (emphasis added).

[7] MAOs are left to make such decisions on the basis of their own data. CMS collects, but does not share with MAOs, information about insurers that may be primarily responsible for health expenses incurred by Medicare beneficiaries. *See* 42 U.S.C. § 1395y(b)(7)(A)(i)

between the Government as secondary payer and MAOs as secondary payers. While the Government must follow the statutory debt-collection scheme to avail itself of the double-damages remedy, an MAO may sue to collect payment from a primary payer (and thus to enhance its own bottom line) without following any such procedure. Indeed, nothing in the MSP Act or the Medicare Advantage program alters MAOs' state-law rights to be subrogated to the rights of their insureds—to obtain reimbursement from the third-party tortfeasor's insurer *or* the tortfeasor himself.

In sum, the Medicare statute leaves MAOs free to follow their own protocols, and rely on their own data, with respect to both issuing secondary payments and recovering from primary plans. It should be clear from this analysis that Congress would have no reason to create a double-damages remedy for MAOs to recover from primary payers, and in the process of doing so replace state-law subrogation rights. The double-damages rights of action were enacted against the backdrop of the MSP Act's overarching policy goal: to protect the Medicare Trust Funds. Given the lengthy, resource-draining procedure the Government must follow to recover funds, it is unsurprising that it can eventually recover double

---

(requiring insurers to submit information to the Secretary "for the purpose of identifying situations where the [insurer] is or has been a primary plan"); Jennifer Jordan, *Is Medicare Advantage Entitled to Bring a Private Cause of Action Under the Medicare Secondary Payer Act?*, 41 Wm. Mitchell L. Rev. 1408, 1417 (2015) ("CMS does not share Section 111 Mandatory Insurer Reporting (MIR) information with MAOs to assist in coordination of secondary payer provisions.").

damages.

So why the double-damages provision in the *private* right of action? In addition to providing an extra layer of protection to the Medicare Trust Funds, the private right of action also protects Medicare beneficiaries from suffering when a primary payer fails to satisfy its payment obligations under the MSP Act—when the Government makes a conditional secondary payment or when it does not. When it does not, the beneficiary will suffer greater harm because his medical expenses remain unpaid. Either way, when a primary payer withholds compensation of medical expenses for which it is responsible, someone will suffer: either the Government, which must draw on the Medicare Trust Funds, or the beneficiary, who might suffer financially while remaining liable for payment of medical expenses until the primary payer or the Government foots the bill. Thus, the private right of action provides for double damages in order to do two things: first, dissuade primary payers from shirking their payment responsibilities; and second, protect either the Government (where the Government has elected to pay expenses conditioned on reimbursement) or the beneficiary (where the Government has elected not to pay those expenses), depending on who was harmed by the delinquency.

But this calculus is different when it comes to MAOs. Because the Government pays a per capita rate to MAOs, the Medicare Trust Funds are not

21

impacted by a primary payer's failure to reimburse an MAO.  When an MAO, rather than the Government, pays expenses, double damages are not needed to dissuade a primary payer from impacting negatively the Medicare Trust Funds, because the Medicare Trust Funds are insulated from the primary payer's delinquency.  This is all by design: the contractual relationship between the Government and MAOs shifts the financial risk away from the public fisc and toward MAOs' business objectives.  Even so, MAOs do not have to follow the cumbersome debt-recovery procedure the Government must employ to bring suit to recover from primary payers.

Further, awarding double damages to MAOs is not necessary to protect the interests of their insureds.  As discussed, MAOs have greater flexibility when it comes to paying and seeking reimbursement.  Under the MSP Act and the Medicare Advantage program, an MAO is well within its legal rights if—pursuant to a contractual provision subrogating it to its insured's right to recover medical expenses from a primary payer—it chooses to simply refuse payment in a case in which a primary payer is responsible under the MSP Act for medical expenses incurred by an insured.  That MAOs *can* choose to pay and seek reimbursement does not mean that they must do so.  Further, that MAOs may refuse to pay such claims strictly for purposes of increasing their bottom line certainly does not turn their insureds into clay pigeons: a harmed insured can avail himself of the private

22

right of action and recover double damages from the delinquent primary payer. Hence, allowing MAOs to recover double damages against a primary payer that refuses to reimburse them for payments the MAOs elected to make—notwithstanding MAOs' legal right to refuse to pay in the first place—simply creates a windfall for MAOs that do elect to pay.

Put simply, neither the private right of action's text nor the policy it implements warrants extending its double-damages entitlement to MAOs.

C.

Moreover, nothing in the Medicare Act, and nothing in the Medicare Advantage program, preempts MAOs' subrogation rights under state law. In fact, the latter expressly preserves them. But the panel majority's decision renders those rights irrelevant due to the ruthless and logic-defying scheme it creates.

1. *Medical Insurers' Rights Under State Law*

At common law, once a tortfeasor's liability is established by a judgment for the insured that includes compensation for medical expenses paid by a medical insurer as a secondary payer, or once the tortfeasor agrees to a settlement that includes such expenses, the medical insurer has the right to seek reimbursement of the sums it expended. The medical insurer can preserve this right by including a reimbursement provision in its contract with the insured. If the insured refuses to reimburse, the medical insurer can seek to enforce the

23

contract.  *See, e.g.*, Jacob A. Stein, *2 Stein on Personal Injury Damages* § 7:35 (3d ed. 2017).

In addition, many jurisdictions create a reimbursement right by operation of law, so that a medical insurer may recover the monies it paid from the insured even in the absence of a reimbursement provision in the contract.  *See, e.g.*, Fla. Stat. § 768.76(4) ("A provider of collateral sources that has a right of subrogation or reimbursement that has complied with this section *shall* have a right of reimbursement from a claimant to whom it has provided collateral sources if such claimant has recovered all or part of such collateral sources from a tortfeasor." (emphasis added)); *Measom v. Rainbow Connection Preschool, Inc.*, 568 So. 2d 123, 124 (Fla. Dist. Ct. App. 1990) (explaining that "Section 768.76(1) does not require a contractual right" for an insurer to recover payments made to a plaintiff who subsequently recovers those payments from a tortfeasor).  This is known as "equitable subrogation."  *See* Thomas & Mootz, *supra*, at § 158.05 ("Equitable subrogation . . . is permitted in situations where fairness requires it. . . . [E]quitable subrogation rights arise simply by virtue of the payment made by the insurer [on behalf of its] insured. . . .  There is no reliance on a written contract or express agreement.").[8]

---

[8] All three states in this Circuit recognize the rights of medical insurers to seek reimbursement under both contract law and under the doctrine of equitable subrogation.  Georgia

24

Whether the medical insurer's reimbursement rights are contractual or

equitable, the medical insurer's reimbursement right arises from its relationship

with the insured.  Because a tortfeasor's liability insurer has no legal relationship

---

recognizes contractual reimbursement by statute, as long as the plaintiff has been made whole by the judgment or settlement.  O.C.G.A. § 33-24-56.1(b) states,

> In the event of recovery for personal injury from a third party by or on behalf of a person for whom any benefit provider has paid medical expenses or disability benefits, the benefit provider for the person injured may require reimbursement from the injured party of benefits it has paid on account of the injury, up to the amount allocated to those categories of damages in the settlement documents or judgment, if:
>
> (1) The amount of the recovery exceeds the sum of all economic and noneconomic losses incurred as a result of the injury, exclusive of losses for which reimbursement may be sought under this Code section; and
>
> (2) The amount of the reimbursement claim is reduced by the pro rata amount of the attorney's fees and expenses of litigation incurred by the injured party in bringing the claim.

Georgia courts also recognize a medical insurer's right to seek reimbursement under equitable principles, to wit, preventing double recovery.  *See Carter v. Banks*, 254 Ga. 550, 552, 330 S.E.2d 866, 867–68 (Ga. 1985) ("The right of subrogation can arise from one of three sources.  (1) It is an equitable principle founded on the proposition that an insured ought not to collect damages for his loss from both his insurer and the tortfeasor, a double recovery.  Therefore, in the eyes of equity, the insurer who has paid the insured his loss should recover from the tortfeasor. . . . (2) It may arise out of the contract between the insurer and the insured.  This is sometimes referred to as "conventional subrogation."  (3) The right may be declared by statute." (citations omitted)).

Alabama recognizes subrogation rights under principles of equity.  *See Int'l Underwriters/Brokers, Inc. v. Liao*, 548 So. 2d 163, 164 (Ala. 1989), *opinion reinstated sub nom. Ex parte State Farm Fire & Cas. Co.*, 764 So. 2d 543 (Ala. 2000) ("Subrogation is an equitable doctrine intended to prevent the insured from recovering twice for a single injury and to reimburse the insurer for payments it made that should, in fairness, be borne by another.  When the insured recovers the full amount of his damages from a third-party tort-feasor, the insurer is entitled to reimbursement of payments made on the policy." (citations omitted)).  Under Alabama law, medical insurers can recover their outlays even before the plaintiff has been made whole.  *Ex parte State Farm*, 764 So. 2d at 545.

Florida recognizes a medical insurer's subrogation rights under both contractual and equitable principles.  Its reimbursement statute is discussed above.  Like Georgia, Florida requires the plaintiff to have been made whole before his medical insurer may invoke its subrogation rights.  *Humana Health Plans v. Lawton*, 675 So. 2d 1382, 1384 (Fla. Dist. Ct. App. 1996).

with the plaintiff's medical insurer, the liability insurer owes no independent duty to reimburse the medical insurer. *See, e.g.*, O.G.G.A. § 33-24-56.1(e) ("Subrogation for medical expenses and disability payments by a benefit provider against a person at fault for injury is prohibited and no defendant or liability insurance carrier shall include any insurer seeking reimbursement . . . as a copayee on any check or draft in payment of a settlement or judgment."); 15 *Appleman on Insurance Law & Practice Archive* § 111.1 (2nd ed. 2011) ("Even though third party claimants are third-party contract beneficiaries under a liability insurance contract, these third-party claimants have no direct right to sue the liability insurer for direct payment. Absent a state statute or judicial decision, a third-party claimant cannot sue a liability insurer directly until the third party obtains a judgment against the insured or a settlement agreement."). To secure reimbursement, then, the medical insurer must go after the insured—the person with whom it has a contractual relationship.

The Medicare Advantage program preserves and codifies this common law reimbursement right for private insurers acting as MAOs. 42 U.S.C. § 1395w-22(a)(4) says an MAO that issues a secondary payment pursuant to the MSP Act "may . . . charge" either the primary payer or the insured to the extent the insured has received payment from a primary payer. Indeed, the statute says that MAOs may do so "notwithstanding any other provision of law." *Id.* Hence, the Medicare

26

Advantage statute preempts any state-law provisions that abridge the codified right of MAOs to seek reimbursement.[9]

## 2. *The Old Litigation Model*

The litigation model that has developed at common law reinforces these state-law rights. That model proceeds as follows. Suppose a person with medical insurance is injured as a result of a tortfeasor's conduct. The insured's medical insurer pays medical expenses on the insured's behalf. The insured (the medical insurer's subrogor) files suit against the tortfeasor, in which the insured's claim includes the medical insurer's claim for medical expenses. In such a case, the insured is effectively suing for the use and benefit of the medical insurer, the subrogee of the insured's claim.

Thus, whether they arise by contract or in equity, the medical insurer's rights in the case are derived from the medical insurer's relationship with the insured who filed the suit. The medical insurer therefore cannot independently bring its claim for expenses against the tortfeasor, because it has no legal rights as against the tortfeasor outside of its relationship with the insured. If the insured were to sue the tortfeasor for a portion of his damages and then later sue the tortfeasor a second time to recover the medical expenses paid by the medical

---

[9] This is an example of conflict preemption. *See Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S. Ct. 399, 404 (1941) ("Our primary function is to determine whether, under the circumstances of this particular case, [a state] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.").

27

insurer, the insured would be barred from doing so under state rules against splitting causes of action. So, too, would the medical insurer be barred, because the medical insurer can only claim rights against the tortfeasor while standing in the shoes of the insured.

However, this limitation on the insurer's right to sue the tortfeasor does not frustrate the medical insurer's subrogation rights. State subrogation laws protect the medical insurer's interest in the insured's tort claim by allowing the insurer to intervene in the suit to obtain its share of the recovery from the tortfeasor. If the medical insurer intervenes in the insured's suit, its presence in the suit will not normally be communicated to the jury, because notifying the jury that an insurance company "owned" the insured's claim could prejudice the claim. *See, e.g.*, Ala. R. Evid. 408(a)(1) (prohibiting use of settlement offers or agreements to establish the liability of or amount owed by a party). Plus, this arrangement is often more advantageous to the medical insurer at the end of the day: recovery by the insured of other special damages like pain and suffering tends to have a multiplying effect on his recovery of medical expenses.

If the insured prevails, unless the insured and the medical insurer have agreed previously on what portion of the recovery should be signed over to the medical insurer, the court will decide how to apportion the award. *See, e.g.*, *Magsipoc v. Larsen*, 639 So. 2d 1038, 1043 (Fla. Dist. Ct. App. 1994) ("A

28

preferable middle ground is to empower the trial court as a fact-finder to determine what portion (if any) of the settlement is fairly allocable to medical costs and expenses in the equitable distribution proceeding."). This gives the court discretion, in deciding how to divvy up the funds, to weigh the equities of the case, such as how much is needed to make the insured whole and whether the insured has a contractual obligation to reimburse the medical insurer for the claimed expenses.

### 3. *The Impact of This Court's Decision on the State-Law Scheme*

In light of the well-established and effective scheme detailed above, and the Medicare Advantage Act's express statutory preservation of that scheme, why would an MAO need to avail itself of the MSP Act's private right of action? Well, it wouldn't. But alas, this Court's decision renders the above provision irrelevant. As framed by the Court's decision, an MAO's reimbursement right is vastly expanded. The MAO is entitled to a strict right of full recovery from a primary payer for expenses it incurred on an insured's behalf, to the extent those expenses were proximately caused by the tortfeasor, provided only that the primary payer insured the tortfeasor's liability. An MAO may enforce this right even though the tortfeasor's insurer previously remitted the expenses in settling the insured's tort claim or in satisfying the insured's judgment.

Thus, this Court's opinion amounts to a rewriting of state insurance laws.

29

An MAO who makes a secondary payment now has a right to seek reimbursement of its outlays from the tortfeasor's liability insurer that is independent of its insured's rights under tort law. Therefore, the MAO is in effect an unnamed beneficiary of the liability insurer's policy. The MAOs' rights are no longer derivative but primary.

As a result, many substantive state-law rules are rendered inoperative. In cases that ended in settlement, this has the effect of rendering releases of liability under state law a nullity, because an insured's release executed in favor of the liability insurer cannot release the liability insurer from the reimbursement responsibility it has to MAOs that is independent of its responsibilities to recompense the insured. And state laws precluding the use of a compromise settlement to establish a tortfeasor's (and thus the liability insurer's) liability are no longer of moment. *Au contraire*, a liability insurer's execution of a settlement agreement *creates* its liability to the MAO.

In cases that ended in judgment, satisfaction of the judgment by the liability insurer does not alter the MAO's right to seek reimbursement from the liability insurer after the fact. Normally, "satisfaction of [a] judgment on the record extinguishes the claim and ends the controversy." 47 *Am. Jur. 2d Judgments* § 766. Not so here. The MAO's "controversy" with the liability insurer cannot end with termination of the insured's "controversy," because the two "controversies"

30

are unrelated to one another.  Unrelated, that is, with one glaring exception: the liability insurer's duty to reimburse the MAO is triggered by the termination of its controversy with the insured, because any resolution of that case operates as a *de jure* adjudication of its liability to the MAO.

So, too, does the private right of action, as interpreted by the Court, render inoperative the corollary rule against splitting causes of action.  *See* Philip J. Padovano, 5 *Florida Civil Practice* § 3:6 (2018) ("All damages flowing from an event or transaction must be claimed in a single lawsuit. . . . [T]he courts have said that a party may not split an action arising from a single event into two or more claims for damages.").  Here, not only is a separate cause of action over the same conduct authorized; the majority's rule works such that a judgment in one suit *creates* the basis for a second, split cause of action over the same conduct.

In addition, state equitable doctrines preventing unjust enrichment of the insured have no bearing in the Medicare Advantage context.  Because an MAO has an independent right to seek reimbursement of its outlays from the tortfeasor's liability insurer, it need not seek reimbursement from its insured if the insured recovered those outlays from its tort suit.  The insured can keep the portion of the settlement or judgment that would have been apportioned to the medical insurer under the former litigation model.  Hence, as illustrated by the result of the instant case, double recovery is now permitted.

31

#### 4. *This Court's New Litigation Model*

As a result of these sweeping changes to the old scheme, the litigation model must adapt as well. To begin, settlements will be virtually eliminated. *See infra* p. 29. Suppose the case does not settle and is tried. The insured obtains a judgment, which includes the MAO's expenses, against the tortfeasor, and the liability insurer satisfies the judgment. The judgment established the liability insurer's responsibility to reimburse the MAO; hence, the MAO—having remained silent during the insured's controversy with the tortfeasor—demands payment from the liability insurer. Since it already paid the MAO's outlays to the insured in satisfaction of the judgment, the liability insurer may refuse to pay the MAO. If it does so, the MAO can sue the liability insurer for double damages. If the liability insurer defends on the ground that *res judicata* bars the MAO's claim, the liability insurer will lose. Although the injury giving rise to the MAO's payment of medical expenses on behalf of the insured has already been litigated, the MAO's independent right of reimbursement from the liability insurer is untouched by that prior litigation. If the liability insurer defends on the basis of the common law rule against splitting a cause of action, it will still lose. Although the same series of events that gave rise to the MAO's reimbursement claim was already litigated and the insured's tort claim included the MAO's outlay (meaning that a separate suit brought by the insured would normally constitute a split cause

32

of action), there is no split cause of action because the MAO's reimbursement right is no longer derivative of the insured's right to recover in tort. Hence, the causes of action are separate.

To recapitulate, the results of the insured's judgment against the tortfeasor are as follows. First, the insured gets to keep the portion of the judgment representing the MAO's outlay. Second, and as a result of the first, the liability insurer must pay double. What it paid to the insured is irrelevant with respect to what it owes the MAO. Third, state laws precluding the MAO's suit on the basis of *res judicata* are effectively nullified. Finally, state laws prohibiting the splitting of causes of action are similarly nullified. This is this Court's new litigation model.

### 5. *How the Court's Decision Will Impact Litigant Conduct*

These upheavals of state law will change many behaviors. To begin, a liability insurer settles an insured's case at its own peril. As a result of MAOs' independent reimbursement right, to avoid double payment of an MAO's outlay, the insurer must conduct a comprehensive investigation to ferret out the possibility of an MAO's involvement immediately upon receiving an insured's demand for compensation. Even if it does so and discovers nothing, it will be on the hook if an MAO later comes calling. Further, in a case in which an MAO is involved, the liability insurer simply will not settle unless the MAO and the insured agree on the

33

amount that will go to the MAO upon payment and unless the settlement expressly makes the MAO a payee of that amount.

If the parties do not reach a compromise and the insured's case goes to trial, absent modification of state judgment rules, the liability insurer will likely end up paying the MAO's expenses twice if it loses the case. Because the MAO is not a subrogee and enjoys an independent cause of action, the trial court would have no basis under current state law to distribute any part of the insured's recovery to the MAO. The MAO would have no reason to submit to the trial court's "jurisdiction," anyway. It can receive full reimbursement and double damages from the liability insurer in a separate suit if the liability insurer refuses to pay it after completion of the insured's suit. So it would have no need to intervene; indeed, the lucrative prospect of double damages *incentivizes* MAOs to remain silent while their insureds proceed with litigation. Why would an MAO get involved in its insured's lawsuit and try to recover its outlays when it can wait the litigation out and then seek double its outlays later?

The states in this Circuit will have to adopt new procedures to prevent duplicate litigation of this sort. To prevent forcing liability insurers to make double payments of MAOs' outlays, state law must bar insureds from including any sums expended by MAOs in their damages claims. If that rule does come into existence, liability insurers must be able to invoke that bar at trial in order to

34

protect themselves.  Thus, during litigation, a liability insurer will have to determine which of the insured's claimed expenses might have been paid by an MAO, which means additional discovery time and effort.

Alternatively, state law could require special verdicts that allow for specification of MAOs' expenses.  In such a case, a liability insurer would pay the MAO the amount of the special verdict as part of its satisfaction of the judgment.  If the MAO later tried to file a separate reimbursement suit, the liability insurer could plead collateral estoppel.  This remedy presumes, however, that an MAO will be revealed during the course of litigation.  And as the facts of the instant case demonstrate, that is far from a foregone conclusion.

*6. How the Court's Decision Will Affect the Insurance Industry*

Liability insurers will have to adapt quickly to this Court's decision.  Every liability insurer in this Circuit will have to account for the fact that their policies will necessarily include MAOs as unnamed beneficiaries.  In fact, this coverage might or might not spring into action in any case in which their policyholders commit a tort, because an MAO could come knocking in any such case.  And, because there could be a mistake by any liability insurer as to what it owes an MAO, all liability insurers must account for the possibility of double damages.  They must therefore build these additional risk factors into their actuarial

35

calculations, meaning of course that the risk will ultimately be passed on to consumers in the form of higher premiums.

*     *     *

This is a statutory interpretation case. Congress applied the MSP Act's secondary payment scheme to Medicare Advantage, which means that MAOs can make secondary payments pursuant to that scheme, for which primary payers are responsible. This Court's task was to determine whether Congress provided a means for MAOs to enforce primary payers' responsibility. The Court's first step in deciding that question should have been to consider how MAOs' recovery rights under Medicare Advantage harmonize with the Government's recovery rights under the MSP Act's provisions. *See* Antonin Scalia & Bryan A. Garner, *Reading Law* 252 (2012) ("Any word or phrase that comes before a court for interpretation is . . . part of an entire *corpus juris*. . . . Hence laws dealing with the same subject . . . should if possible be interpreted harmoniously.").

Had it done so, the Court would have realized that Congress intended to, and did, protect MAOs acting as secondary payers by preserving their state-law subrogation rights. Congress manifested this intent in 42 U.S.C. § 1395w-22(a)(4), which protects MAOs' right to include a subrogation clause in their contracts with insureds. But the Court ignored this provision. It interpreted the Medicare Advantage scheme as if § 1395w-22(a)(4) did not exist, as if MAOs would have no

36

reimbursement rights without extension of the private right of action to protect them. And so the Court construed MAOs' rights as secondary payers under Medicare Advantage to be the same as the Government's rights as a secondary payer under the traditional Medicare scheme.

So now we have two models. Under one model, the § 1395w-22(a)(4) model, an MAO can recover its outlay by standing in the shoes of its insured and suing a liability insurer *as part of* its insured's tort action. If it follows this model, the MAO is subject to a number of rules designed to ensure justice is done in the case, including the rule barring recovery by the MAO unless and until the insured has been made whole and the requirement that the court apportion the insured's recovery as the equities dictate. This model has worked for many years and in many contexts; indeed, MAOs use this model all the time to recover their outlays when they make secondary payments to insureds who don't have Medicare Advantage.

Under the other model, the model created by the Court's interpretation of the private right of action, 42 U.S.C. § 1395y(b)(3)(A), an MAO can recover its outlay from the liability insurer directly. It may do so not on the basis of rights derivative of the insured, but by its own rights and at its own option. And it may do so notwithstanding the tortfeasor's denial of liability and regardless of whether the insurer has already paid the MAO's outlays to the insured. And there are no

37

equitable restrictions on this new model: the MAO need not submit to court apportionment. Moreover, double recovery by the MAO's insured is just fine. On top of all that, if the liability insurer balks for any reason, the MAO may recover *double* its outlays.

MAOs now have these two options for obtaining reimbursement. They are free to choose either one. Is there any question as to which one they will pick? Of course not. MAOs will always choose the option that avoids all of the rules that could be disadvantageous to an MAO, imposes no new costs or limitations on the MAO, and might provide double recovery. That model is the new one. So while the old model, the state-law scheme that Congress protected in § 1395w-22(a)(4), will stay on the statute books, it will be rendered inoperative in all practical respects, because no MAO in its right mind will use it.

This Court has handed down an extraordinary decision. Is it possible that Congress did not realize when creating Medicare Advantage that it did not need to protect MAOs' subrogation rights under state law, because it had, seventeen years earlier, used its crystal ball to preemptively provide them with the same protections as the Government when acting as a secondary payer? I find nothing in the MSP Act's plain text, its statutory context, or its underlying policy that suggests Congress acted in such a Sibylline manner. Thus, I would revisit the Court's decision.

38

III.

In conclusion, I agree with Judge Pryor that this case was wrongly decided.

I would therefore grant en banc review.