LOGUE, J.
We have for review a trial order certifying a class action against Porsche Cars North America, Inc. (“Distributor”). In analyzing whether common issues will predominate over individual issues, the trial court used an outdated definition of unfair trade practices. When the updated definition is used, common issues will not predominate. We accordingly reverse and remand.
*1093 BACKGROUND
A. Distributor.
Distributor is a wholly-owned subsidiary of Porsche A.G. (“Porsche”). Porsche is the German company that designs and manufactures Porsche vehicles for worldwide distribution. Distributor, the exclusive importer and distributor of Porsche cars in the United States, purchases vehicles and parts from Porsche and sells them to authorized dealerships in the United States for subsequent sale to consumers. Distributor does not sell directly to consumers.
B. High Intensity Discharge Headlights.
This case focuses on Porsche’s High Intensity Discharge Headlights (“Headlights”). The Headlights are an upscale amenity in the luxury car market. The intense blue-white light given by the Headlights is closer to natural daylight than the yellowish light of regular headlights. The Headlights provide better nighttime visibility than older types of headlights. Since model year 2000, the Headlights have been offered as standard or optional equipment across the Porsche vehicle line. The Headlights were mounted on modules that were slid into a plastic tray in the fender and clamped in place. This mounting made the Headlights relatively less expensive to install and repair. At the same time, however, it made them easier to steal. A knowledgeable thief could pry the Headlights out of the vehicle in a few moments by forcing a large screwdriver or pry bar under the lights, bending the clamp, and breaking either the head lamp unit or baseplate. This process would also damage the fender, sometimes extensively.
C.Crime Wave of Headlight Thefts.
Distributor became aware in late 2003 or early 2004 that the Headlights were increasingly becoming the target of theft. Distributor reported this problem to Porsche: “According to a Jan. 12, 2004 article in the Miami Herald, theft of Porsche and Nissan headlights is becoming a major problem. Over 60 thefts have occurred in one Miami suburb over the last year.” After exploring various solutions, Porsche determined that design changes would not eliminate the problem of theft and would make the vehicles more expensive to purchase and repair. No changes were made to the Headlights.
The City of Coral Gables experienced a tide of headlight thefts from vehicles of all makes and models that rose in 2002, crested in 2004, and ebbed in 2006. Although headlights were stolen from all makes and models of cars, the rate of headlight thefts from Porsche vehicles was disproportionately higher than the rates of thefts from other cars. We summarize pertinent details provided in a larger chart submitted into evidence as follows:[1]
[[Image here]]
*1094 [[Image here]]
The Coral Gables Police Department formed a task force that undertook efforts to eliminate headlight theft. Arrests were made and the incidence of headlight thefts from all cars began to steadily and significantly decline. Since 2007, reported headlight thefts have become increasingly rare in Coral Gables. No evidence indicated that the rate of theft in Coral Gables projected across the State; to the contrary, some evidence indicated the problem was regional and centered mainly in South Florida.
D. The Class Representatives.
Class representatives, Peter Diamond, Irma Matos, Richard Sharp, and Luis Alayo-Riera, are all residents of Miami-Dade County, Florida, who purchased replacement headlights after the Headlights in their vehicles were stolen. Some class representatives knew about the problem of thefts when they leased or purchased their vehicle, others did not. Irma Matos, for example, had no knowledge regarding the special characteristics of the Headlights and no idea that the Headlights were targeted for theft until after three different sets of Headlights were stolen. Exasperated after the three incidents of stolen Headlights, she terminated her lease early and traded her vehicle for a BMW.
Luis Alayo-Riera, on the other hand, was a more sophisticated and knowledgeable buyer. A self-described “Porsche fanatic” and “car enthusiast,” he was attracted by the characteristics of the Headlights. From both discussions with friends and articles he read, he learned about the problem of the thefts in South Florida. Nevertheless, he intentionally leased a Porsche equipped with the Headlights. Later, when thieves twice stole his Headlights, he consciously chose to have the same type of Headlights reinstalled. After the second incident, however, he began taking extra security measures, including parking his car next to the security guard post in the office parking lot where the thefts had occurred. The thefts stopped. He subsequently purchased the vehicle with the Headlights. When he finally sold the vehicle, he admitted the car suffered no diminished value due to the Headlights. To the contrary, he maintained the Headlights enhanced the sale price of the car.
E. The Legal Theory.
In their claim for a class action, the class representatives assert unfair trade practices and unjust enrichment claims. They allege Distributor acted unfairly by profiting from distributing a product highly susceptible to theft without taking remedial steps. Specifically, Distributor failed to “notify owners of the flaw and potential risk of theft so they could take their own precautions,” to “offer replacement lights at reduced costs,” and to “work with law enforcement agencies to assist in the prevention of the theft of their headlights.”[2] This course of conduct, the representatives members allege, violated the Florida Deceptive and Unfair Trade Practices Act (“FDUTPA”). §§ 501.201-.213, Fla. Stat. They seek consequential damages in the form of the cost of repairing the cars and replacing the stolen Headlights; they do *1095 not claim that the vehicles they purchased or leased were worth less than the prices paid.[3]
The unjust enrichment claim states that plaintiffs conferred a benefit on Distributor by purchasing replacement Headlights which were ultimately supplied by Distributor, and that it would be inequitable to allow Distributor to profit from customer losses caused by a design flaw of which Distributor was fully aware yet failed to remedy.
F. The Classes Certified.
Plaintiffs sought certification of a class consisting of:
All Florida owners or lessees of Porsche 911 (models 996 and 997), Boxster (986 and 987) or Cayman vehicles whose HID headlights were forcibly removed from outside their vehicles during the period from May 31, 2002 until present.
Following a hearing on the motion, the trial court granted the motion and certified the class described above to pursue the FDUTPA violation claim. The trial court also certified two subclasses to pursue the unjust enrichment claims defined as:
Unjust Enrichment Subclass 1: All owners described above whose headlights were removed on only one occasion during the time period described above.
Unjust Enrichment Subclass 2: All owners described above whose headlights were removed on more than one occasion during the time period described above.
Distributor appeals that order.
ANALYSIS
I. Determining Class Certification: Will the Proof of the Class Representatives’ Case Necessarily Prove the Case of the Absent Class Members?
The threshold requirements for class certification are well known: a class will be certified based upon a showing of numer-osity, commonality, typicality, and adequacy of representation. Fla. R. Civ. P. 1.220(a). In addition to meeting these threshold requirements, the class must fall within one of the three different types of class actions established in Florida Rule of Civil Procedure 1.220(b).
The focus of a class certification hearing is not on whether the class representatives will prevail at trial. Sosa v. Safeway Premium Fin. Co., 73 So.3d 91, 105 (Fla.2011). Instead, the focus is on “whether a litigant’s claim is suited for class certification” and whether the proposed class provides “a superior method for the fair and efficient adjudication of the controversy.” Id. at 105-06. “However, if consequential to its consideration of whether to certify a class, a trial court may consider evidence on the merits of the case as it applies to the class certification requirements.” Id. at 105'.
The trial court certified the present case as a rule 1.220(b)(3) class action. In a(b)(3) class action, not all issues of fact and law are common, but common issues *1096 predominate over individual issues. Fla. R. Civ. P. 1.220(b)(3). Common issues predominate when, considering both the rights and duties of the class members, the proof offered by the class representatives will necessarily prove or disprove the cases of the absent class members. As the Supreme Court explained in Sosa:
[A] class representative establishes predominance if he or she demonstrates a reasonable methodology for generalized proof of class-wide impact. A class representative accomplishes this if he or she, by proving his or her own individual case, necessarily proves the cases of the other class members.
73 So.3d at 112 (internal citation omitted). The Court added that the class representative’s case must not merely raise a common question, but that proof of the class representative’s case must also “answer[ ] the question.” Id. at 111.[4]
II. The Trial Court Used an Outdated Definition of Unfair Trade Practice.
FDUTPA declares unlawful “[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce.” § 501.204(1), Fla. Stat. The term “unfair” is not defined in FDUTPA. Here, the trial judge defined unfair trade practice as one that “offends established policy” and “is immoral, unethical, oppressive, unscrupulous or substantially injurious to customers.” This definition derives from a 1964 Federal Trade Commission policy statement. See Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, Statement of Basis and Purpose, 29 Fed. Reg. 8324, 8355 (July 2, 1964) (“1964 Policy Statement”).
In 1980, however, the Federal Trade Commission updated its definition of unfair trade practice. “The Commission’s [1980] Policy Statement was basically a refinement of an earlier three-part standard of unfairness it had set out in 1964.” Am. Fin. Servs. Ass’n v. F.T.C., 767 F.2d 957, 971 (D.C.Cir.1985). The new definition established a three-pronged test for “unfairness,” which requires that the injury to the consumer:
(1) must be substantial;
(2) must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and
(3) must be an injury that consumers themselves could not reasonably have avoided.
FTC Policy Statement on Unfairness (Dec. 17, 1980) (“1980 Policy Statement”), appended to Int’l Harvester Co., 104 F.T.C. 949, 1070 (1984); also available at http:// www.fte.gov/ftc-policy-statement-on-unfairness (last visited on June 4, 2014). An excerpt of the 1980 Policy Statement is appended to this opinion.
We must decide whether Florida law adopts the definition of unfairness contained in the 1980 Policy Statement. We hold that it does. The Legislature provided that violations of FDUTPA include violations of “[t]he standards of unfairness and deception set forth and interpreted by *1097 the Federal Trade Commission or the federal courts.” § 501.203(3)(b), Fla. Stat. (emphasis added). Included are standards of unfairness issued “as of July 1, 2013.” Id.
The reference to “standards of unfairness” “as of July 1, 2013” is the product of a long legislative history in which the Florida Legislature amended FDUTPA in 1983, 2001, 2006, and 2013, for the specific purpose of adding to Florida Law interpretations by the Federal Trade Commission or federal courts that occurred since the last statutory amendment.[5] This series of amendments was necessary because a statute simply adopting all future changes to federal law would be an unconstitutional delegation of the power to legislate. Dep’t of Legal Affairs v. Rogers, 329 So.2d 257, 267 (Fla.1976).
In light of this history, the 1980 Policy Statement is clearly one of the “standards of unfairness” interpreted by the Federal Trade Commission and federal courts. See, e.g., In re Orkin Exterminating Co., 108 F.T.C. 263 (1986), aff'd, 849 F.2d 1354 (11th Cir.1988), cert. denied, 488 U.S. 1041, 109 S.Ct. 865, 102 L.Ed.2d 989 (1989) (discussing and applying the 1980 Policy Statement’s definition of unfair trade practice). By operation of law, therefore, it was incorporated into Florida law in the 1983 amendments to FDUTPA and readopted by the subsequent amendments. See amendments to § 501.203(3)(b), note 5, supra.
In nearby statutory sections, the Legislature reiterated that FDUTPA should be interpreted in line with federal law. For example, section 501.204(2) provides:
It is the intent of the Legislature, that, in construing subsection (1), due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1) as of July 1, 2013.
FDUTPA’s reference to section 45(a)(1) of the United States Code is no coincidence. Section 45(a)(1) is the federal law upon which FDUTPA was modeled. Its language is virtually identical to section 501.204(1), Florida Statutes, which is the keystone provision of FDUTPA. Section 45(a)(1) provides: “Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.” 15 U.S.C. § 45(a)(1). The 1980 Policy Statement obviously constitutes an interpretation by the Federal Trade Commission of the term “unfair” as it is used in section 45(a)(1) and is therefore entitled to “due consideration and great weight” when construing FDUTPA.
These legislative directives are consistent with FDUTPA’s express purpose— “[t]o make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection.” § 501.202(3), Fla. Stat. Thus, FDUTPA expressly states that Florida is to be guided by and follow the interpretations of unfair trade practices under the Federal Trade Commission Act made by the Federal Trade Commission and the federal courts.
In 1994, Congress codified the 1980 Policy Statement into federal statutory law. Federal Trade Commission Act Amendments of 1994, Pub. L. No. 103-312, § 9, 108 Stat. 1691 (codified as amended at 15 U.S.C. § 45(n) (1994)) (“The Commission shall have no authority under this section or section 57a of this title to declare unlawful an act or practice on the grounds that *1098 such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to com-petitionThe codification of the 1980 Policy Statement’s definition of unfair trade practice into federal statutory law does not terminate its relevance to Florida law. Nothing in the text of FDUTPA provides that a Federal Trade Commission and federal court interpretation stops being authoritative in Florida if it becomes codified into federal law. While the definition has now been adopted by Congress, it still remains an interpretation that originated with the Federal Trade Commission and used by the federal courts before it was adopted by Congress.
Nor is this analysis altered by the fact that Florida courts, including this court, have continued to cite in passing to the definition of unfairness found in the 1964 Policy Statement. See, e.g., PNR, Inc. v. Beacon Prop. Mgmt., Inc., 842 So.2d 773, 777 (Fla.2003); Suris v. Gilmore Liquidating, Inc., 651 So.2d 1282, 1283 (Fla. 3d DCA 1995); Cummings v. Warren Henry Motors, Inc., 648 So.2d 1230, 1233 (Fla. 4th DCA 1995); Urling v. Helms Exterminators, Inc., 468 So.2d 451, 453 (Fla. 1st DCA 1985). The references to the Federal Trade Commission’s 1964 definition of unfairness in these cases are not rejections of the 1980 definition. To the contrary, because they relied on the Federal Trade Commission’s 1964 Policy Statement, these cases confirm that Florida looks to Federal Trade Commission interpretations of the term “unfair trade practice.” The issue of whether the updated 1980 definition became part of Florida law was simply not before those courts.
In the present case, however, we are squarely faced with the issue of whether Florida has adopted the 1980 Federal Trade Commission definition of unfair trade practice. Following the clear and unambiguous directive of sections 501.203(3)(b), 501.204(2), and 501.202(3), Florida Statutes, we hold the 1980 Policy Statement’s definition of unfair trade practice should be used when interpreting FDUTPA.
III. Using the Correct Definition of Unfair Trade Practice, Common Issues of Law and Fact Will Not Predominate.
The trial court adopted the premise that Distributor’s actions can be found to be an unfair trade practice regardless of whether class members knew and could have avoided the risk of the Headlight thefts. From this premise, it reasoned “an individual class member’s pre-purchase knowledge of the potential risk of theft is not relevant to the Plaintiffs FDUTPA claim.” It then concluded common issues will predominate because either Distributor’s “actions will be unfair to all class members or they will not be unfair to any of them.” Because we disagree with the premise, we disagree with the conclusion.
The individual class member’s knowledge of the risk of Headlight theft bears on whether Distributor’s practice was unfair because it impacts whether the consumer could reasonably avoid the risk. Given the nature of the claim in this case — that the Headlights functioned properly as headlights but were too attractive and susceptible to theft — an individual class member’s knowledge of the risk of theft goes to the heart of his or her claim.
To prove an unfair trade practice, the class must prove that the injury caused by the allegedly unfair trade practice could not have been reasonably avoided by the consumers. See 1980 Policy Statement, supra. The idea behind the reasonably *1099 avoidable inquiry is that free and informed consumer choice is the first and best regulator of the marketplace: “[cjonsumers may act to avoid injury before it occurs if they have reason to anticipate the impending harm and the means to avoid it, or they may seek to mitigate the damage afterward if they are aware of potential avenues toward that end.” In re Orkin, 108 F.T.C. at 366. For this reason, “consumer information is central to this prong of the unfairness inquiry.” Orkin Exterminating Co., Inc. v. F.T.C., 849 F.2d 1354, 1366 (11th Cir.1988).
This is not to say that individual knowledge must always be considered to determine whether a trade practice was unfair. The individual consumer’s knowledge may not be a relevant factor where, for example, the legal theory of the claim posits that “consumers do not have a free and informed choice that would have enabled them to avoid the unfair practice.” F.T.C. v. Neovi Inc., 598 F.Supp.2d 1104, 1115 (S.D.Cal.2008) (quotation and citation omitted). This scenario would arise where the claim is based on allegations of “some form of seller behavior that unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decisionmak-ing.” F.T.C. v. Direct Mktg. Concepts, Inc., 569 F.Supp.2d 285, 299-300 (D.Mass.2008) (quotation and citation omitted).
Like the decision to purchase a luxury car, the decision to equip a car with a high-end amenity naturally involves an individual consumer’s consideration of whether and how to mitigate the risk of theft. A jury might well find that a consumer who knew the Headlights were targeted by thieves had avenues available to reasonably avoid the risk. This is particularly true where, as here, the problem of theft was greater in some geographic locations than others. If the consumer lived in a high crime area, he or she could have chosen models with the older style of headlights, taken efforts to park in only safe areas, installed alarm systems extending to the mounting module, or, if these options were not acceptable, decline to purchase or lease a Porsche with the Headlights. Given the theory of this case, the knowledge of some class members that the Headlights were prone to theft cannot be ignored.
When the individual knowledge and experience of the consumer is an important element of the cause of action and its defense, there can be no class-wide proof that injury was not reasonably avoidable. This point is illustrated by In re Motions to Certify Classes Against Court Reporting Firms for Charges Relating to Word Indices, 715 F.Supp.2d 1265, 1277 (S.D.Fla.2010), aff'd sub nom. Webber v. Esquire Deposition Services, LLC, 439 Fed.Appx. 849 (11th Cir.2011).
In Court Reporting, plaintiffs brought FDUTPA and unjust enrichment claims on behalf of a proposed class of consumers of court reporting services. Id. at 1268. The plaintiffs alleged that the defendants — certain firms providing legal transcripts — engaged in unfair acts by charging the same per-page price for index pages as transcribed pages. Id.
The court denied the motion for class certification because the plaintiffs would be unable to establish on a class-wide basis that alleged injury was not “reasonably avoidable”:
Some lawyers and other users of court-reporting services — particularly those who are fairly sophisticated (or, at least, experienced) users of such services— could reasonably avoid the index charges by simply relying on their experience and requesting that the court-reporting firms omit (or charge a different per-page rate for) the indices from any transcripts they order. A class definition that includes experienced and *1100 novice users of court-reporting services, necessarily includes those with differing abilities to reasonably avoid the allegedly unfair charge.
Id. at 1277-78. The district court concluded that the class claim failed on the predominance element of class certification under FDUTPA. Id. at 1268.
In the present case, the class representatives similarly are unable to show that the injury was not “reasonably avoidable” on a class-wide basis. The owners who knew and accepted the risk of theft stand in a different legal posture regarding alleged failure to provide notice than owners who did not know. Contrast relatively sophisticated and knowledgeable class members like Alayo-Riera with less knowledgeable and experienced owners like Matos. It would obviously be unfair to class members like Matos to have their claims resolved based upon the facts of class members like Alayo-Riera.
This difference is fatal to the class action. Where the class members present such conflicting factual patterns that could lead to divergent and conflicting legal results, their claims cannot be resolved on a class-wide basis. Instead, to resolve the issue, there would need to be a series of mini-trials to ascertain each absent members’ knowledge of these matters.
IV. The Common Issues will not Predominate as to the Unjust Enrichment Claims.
The unjust enrichment claim also fails to satisfy the requirement that common issues predominate over individual issues. The elements of a claim for unjust enrichment are: (1) plaintiff conferred a benefit o.n the defendant; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff. Fito v. Attorneys’ Title Ins. Fund, Inc., 83 So.3d 755, 758 (Fla. 3d DCA 2011).
“A claim for unjust enrichment ... requires examination of the particular circumstances of an individual case as well as the expectations of the parties to determine whether an inequity would result or whether their reasonable expectations were met.” Kunzelmann v. Wells Fargo Bank, N.A., 2013 WL 139913 (S.D.Fla. Jan. 10, 2013) (citations omitted). “In short, common questions will rarely, if ever, predominate an unjust enrichment claim, the resolution of which turns on individualized facts.” Vega v. T-Mobile USA Inc., 564 F.3d 1256, 1274 (11th Cir. 2009).
Here, the determination of unjust enrichment will turn on individual facts. A court would be hard pressed to conclude that Distributor was unjustly enriched when class members with the sophistication and knowledge of Alayo-Riera continued to seek out the Headlights even when they knew of the thefts. The result might well be different for other members of the class. Because the questions raised by the unjust enrichment claim will not necessarily have common answers, that claim also fails the predominance element required for class certification.
Reversed and remanded for proceedings consistent with this opinion.
APPENDIX
Excerpts from Federal Trade Commission Policy Statement on Unfairness:
FTC Policy Statement on Unfairness
Federal Trade Commission Washington, D.C.
December 17,1980

*1101
Consumer injury

Unjustified consumer injury is the primary focus of the FTC Act, and the most important of the three [1964 Policy Statement] criteria. By itself it can be sufficient to warrant a finding of unfairness. The Commission’s ability to rely on an independent criterion of consumer injury is consistent with the intent of the statute, which was to “[make] the consumer who may be injured by an unfair trade practice of equal concern before the law with the merchant injured by the unfair methods of a dishonest competitor.”
The independent nature of the consumer injury criterion does not mean that every consumer injury is legally “unfair,” however. To justify a finding of unfairness the injury must satisfy three tests. It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided.
First of all, the injury must be substantial. The Commission is not concerned with trivial or merely speculative harms. In most cases a substantial injury involves monetary harm, as when sellers coerce consumers into purchasing unwanted goods or services or when consumers buy defective goods or services on credit but are unable to assert against the creditor claims or defenses arising from the transaction. Unwarranted health and safety risks may also support a finding of unfairness. Emotional impact and other more subjective types of harm, on the other hand, will not ordinarily make a practice unfair. Thus, for example, the Commission will not seek to ban an advertisement merely because it offends the tastes or social beliefs of some viewers, as has been suggested in some of the comments. Second, the injury must not be outweighed by any offsetting consumer or competitive benefits that the sales practice also produces. Most business practices entail a mixture of economic and other costs and benefits for purchasers. A seller’s failure to present complex technical data on his product may lessen a consumer’s ability to choose, for example, but may also reduce the initial price he must pay for the article. The Commission is aware of these tradeoffs and will not find that a practice unfairly injures consumers unless it is injurious in its net effects. The Commission also takes account of the various costs that a remedy would entail. These include not only the costs to the parties directly before the agency, but also the burdens on society in general in the form of increased paperwork, increased regulatory burdens on the flow of information, reduced incentives to innovation and capital formation, and similar matters. Finally, the injury must be one which consumers could not reasonably have avoided. Normally we expect the marketplace to be self-correcting, and we rely on consumer choice — the ability of individual consumers to make their own private purchasing decisions without regulatory intervention — to govern the market. We anticipate that consumers will survey the available alternatives, choose those that are most desirable, and avoid those that are inadequate or unsatisfactory. However, it has long been recognized that certain types of sales techniques may prevent consumers from effectively making their own decisions, and that corrective action may then become necessary. Most of the Commission’s unfairness matters are brought under these circumstances.
*1102 They are brought, not -to second-guess the wisdom of particular consumer decisions, but rather to halt some form of seller behavior that unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decision-making.
Sellers may adopt a number of practices that unjustifiably hinder such free market decisions. Some may withhold or fail to generate critical price or performance data, for example, leaving buyers with insufficient information for informed comparisons. Some may engage in overt coercion, as by dismantling a home appliance for “inspection” and refusing to reassemble it until a service contract is signed. And some may exercise undue influence over highly susceptible classes of purchasers, as by promoting fraudulent “cures” to seriously ill cancer patients. Each of these practices undermines an essential precondition to a free and informed consumer transaction, and, in turn, to a well-functioning market. Each of them is therefore properly banned as an unfair practice under the FTC Act.
FTC Policy Statement on Unfairness (Dec. 17, 1980), appended to Int'l Harvester Co., 104 F.T.C. 949, 1070 (1984) (internal references omitted; first alteration added); also available at http://www.ftc.gov/ftc-policy-statement-on-unfairness (last visited on June 4, 2014).

. This chart compares thefts of all headlights; a comparison of the theft of H.I.D. headlights might be more meaningful,

. The Complaint also alleges that Distributor could have redesigned the vehicles in various ways, but the allegations and facts establish Distributor does not design or manufacture the vehicles, Porsche does.

. This opinion does not reach the issue of whether such a theory of damages is viable. Compare Kia Motors Am. Corp. v. Butler, 985 So.2d 1133, 1140 (Fla. 3d DCA 2008); with Dorestin v. Hollywood Imps., Inc., 45 So.3d 819, 825-32 (Fla. 4th DCA 2010) (Gross, J„ concurring specially).

. The United States Supreme Court recently echoed this sentiment:
What matters to class certification ... is not the raising of common 'questions'-— even in droves — but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of-the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.
Wal-Mart Stores, Inc. v. Dukes, - U.S. -, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011) (citation omitted).

. See Ch. 83-117, 1, at 382, Laws of Fla.; Ch. 2001-39, § 2, at 114, Laws of Fla.; Ch. 2006-196, § 2, at 2072, Laws of Fla.; Ch. 2013-207, § 4, Laws of Fla.