LOGUE, J.
MSPA Claims 1, LLC ("MSPA") asserts it is an assignee of Florida Healthcare Plus, Inc., a defunct Medicare Advantage Organization ("MAO"). MSPA filed a class action seeking to represent other MAO's to prosecute a private cause of action for double damages under the Medicare Secondary Payer Act, 42 U.S.C. § 1395y(b)(3)(A), against Ocean Harbor Casualty Insurance Company, a Florida no-fault automobile insurer.[1] In its complaint, MSPA seeks reimbursement for the medical bills of Ocean Harbor's no-fault insureds which were paid by MSPA's alleged assignor under Medicare, but which should have been paid by Ocean Harbor. The trial court certified the class and Ocean Harbor appealed.
The appropriateness of the class certification turns largely on whether issues common to the class will predominate. Modern Medicare requires beneficiaries to exhaust available private insurance before Medicare pays any medical bills. Moreover, if a private insurer (deemed a "primary plan" in Medicare parlance) wrongfully fails to pay a bill it should have paid, Congress provided a private cause of action for double damages. The nature of proof required under this private cause of action is at the heart of this class certification.
Significantly, MSPA intends to demonstrate Ocean Harbor's responsibility as the primary plan, not by reference to pre-existing settlements by Ocean Harbor as was done in earlier cases, but by insurance contracts entered into under Florida no-fault statutes. MSPA's proof to establish liability therefore will necessarily devolve into a series of mini-trials under Florida no-fault law. § 627.736, etseq., Fla. Stat. For this reason, we reverse.
I. BACKGROUND
A. The Class Certification Hearing.
The hearing on class certification below revealed MSPA brought suit for a class action on behalf of itself and similarly situated *640 entities against Ocean Harbor. The complaint alleged that Ocean Harbor failed to pay covered medical bills on behalf of certain insureds in violation of federal and state law. This failure caused Florida Healthcare Plus to make conditional payments under Medicare for those bills, thereby triggering a right to bring a private cause of action for double damages under 42 U.S.C. § 1395y(b)(3)(A).
MSPA contended class action was appropriate because some or all of the thirty-seven MAO's in Florida might be in a similar situation. Common issues will predominate, it asserted, because its right to payment from Ocean Harbor is "automatic." Proof of liability involves little more than establishing that (1) its assignor made a payment under Medicare to an enrollee or his or her provider, (2) the enrollee was also insured by Ocean Harbor, and (3) Ocean Harbor failed to pay or reimburse the payment. Any other issues as to liability were waived or can be ascertained based on a proprietary algorithm that its lead attorney, John H. Ruiz, developed in consultation with various experts. The algorithm analyzes police reports of accidents and other records that Ocean Harbor must make and report under federal and state law. MSPA asserted that the class-wide damages can be derived from statistical models.
Ocean Harbor countered that MSPA's characterization of its right to reimbursement as "automatic" is based upon Humana Med. Plan, Inc. v. W. Heritage Ins. Co., 832 F.3d 1229, 1232 (11th Cir. 2016), wherein the private insurer's responsibility to pay medical bills was demonstrated by a pre-existing tort settlement in which coverage was admitted and the amount due held in trust. Here, in contrast, Ocean Harbor argued, MSPA does not intend to demonstrate Ocean Harbor's responsibility to pay the medical bills at issue by pre-existing settlements reached by Ocean Harbor. Instead, MSPA intends to demonstrate Ocean Harbor's responsibility by other means, namely, Ocean Harbor's obligations under Florida's no-fault statutes and its' enrollees' no-fault policies with Ocean Harbor. Therefore, Ocean Harbor contended, MSPA's proof to establish liability will necessarily devolve into a series of mini-trials under Florida no-fault law.
B. The Trial Court's Certification Order.
The trial court agreed with MSPA. In regard to the proof required at trial, it held that "Medicare's Recovery Rights are Automatic." Order Granting Pl. MSPA's Mot. for Class Cert., MSPA Claims 1, LLC v. Ocean Harbor Cas. Ins., Case No. 2015-1946-CA-06, 2017 WL 477124 (Fla. 11th Cir. Ct. Feb. 2, 2017). "Moreover, once Medicare or an MAO pays as a secondary payer, there is no law that would penalize Medicare or an MAO, even if it paid in error, since the payment was supposed to be made by the primary payer." Id. at 22. Therefore, the trial court ruled, the required proof of liability consists only of "(1) the defendant's status as a primary plan; (2) the defendant's failure to provide for primary payment or appropriate reimbursement; and (3) the damages amount." Id. at 67.
The trial court found that all of Florida's thirty-seven MAOs were potential class members and, pursuant to Florida Rule of Civil Procedure 1.220(b)(3), certified a class to include:
entities that contracted directly with the Centers for Medicare and Medicaid Services ("CMS") and/or its assignee pursuant to Medicare Part C, including but not limited to, MAO's and other similar entities, to provide Medicare benefits through a Medicare Advantage plan to Medicare beneficiaries for medical services, treatment, and/or supplies as required *641 and regulated by HHS and/or CMS as a direct payer of medical services/supplies and/or drugs on behalf of Medicare beneficiaries either for parts A, B and/or D, all of which pertain to the same medical services and/or supplies that were the primary obligation of the Defendant;
have made payment(s) for medical services, treatment and/or supplies subsequent to January 29, 2009, whereby the MAO, or its assignee, as a secondary payer, has the direct or indirect right and responsibility to obtain reimbursement for covered Medicare services, for which the Defendant, as the primary payer pursuant to Defendant's contract covering the Medicare enrollee pursuant to Florida No-Fault law ( section 627.736(4), Florida Statutes ), was/is financially responsible to a Medicare beneficiary for medical bills incurred as a result of the use, maintenance or operation of a motor vehicle; and
where the Defendant failed to properly pay for medical bills on behalf of its insureds and has otherwise failed to reimburse the MAO's or its assignees for their payment(s) as calculated pursuant to the recognized Current Procedure Terminology ("CPT") codes based on the fee-for-service by the primary payer, as delineated by section 627.736, Florida Statutes, for medical services and/or supplies for their damages.
MSPA, slip op. at 6.
C. The Appeal.
Ocean Harbor timely appealed. Among other matters, it contends the trial court erred in finding numerosity, commonality, adequate representation, predominance, and superiority. We address only predominance and do not reach the other issues.
II. ANALYSIS
A. Requirements of a Class Action.
This case involves the intersection of the law of Florida class actions, Federal Medicare, and Florida no-fault insurance. We examine each area in turn.
"[A]n appellate court reviews a trial court's grant of class certification for an abuse of discretion." Sosa v. Safeway Premium Fin. Co., 73 So.3d 91, 102 (Fla. 2011). Of course, that discretion is to be applied within the structure of rule 1.220. Id. at 103. At the class certification stage, the inquiry does not focus on whether the class representatives will prevail at trial. Id. at 105. "Instead, the focus is on whether a litigant's claim is suited for class certification and whether the proposed class provides a superior method for the fair and efficient adjudication of the controversy." Porsche Cars N. Am., Inc. v. Diamond, 140 So.3d 1090, 1095 (Fla. 3d DCA 2014) (quotations and citation omitted).
"However, if consequential to its consideration of whether to certify a class, a trial court may consider evidence on the merits of the case as it applies to the class certification requirements." Sosa, 73 So.3d at 105. The prerequisites to class certification are well known: numerosity; commonality; typicality; and adequate representation. Fla. R. Civ. P. 1.220(a). In addition to meeting these threshold requirements, the class must fall within one of the three different types of class actions established in rule 1.220(b). Sosa, 73 So.3d at 106 ; Diamond, 140 So.3d at 1095.
The trial court certified this class under subsection (b)(3). "In a (b)(3) class action, not all issues of fact and law are common, but common issues predominate over individual issues." Diamond, 140 So.3d at 1095-96 (citing Fla. R. Civ. P. 1.220(b)(3) ). This occurs "when, considering *642 both the rights and duties of the class members, the proof offered by the class representatives will necessarily prove or disprove the cases of the absent class members." Id. at 1096.
The class representative's case must not merely raise a common question; the proof of the class representative's case must also "answer the question." Id. (citing Sosa, 73 So.3d at 111 ). As the United States Supreme Court stated:
What matters to class certification ... is not the raising of common 'questions'-even in droves-but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.
Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011) (quotation omitted). As the Florida Supreme Court explained in Sosa:
[A] class representative establishes predominance if he or she demonstrates a reasonable methodology for generalized proof of class-wide impact. A class representative accomplishes this if he or she, by proving his or her own individual case, necessarily proves the cases of the other class members.
73 So.3d at 112 (internal citation omitted).
To determine "whether the proof offered by the class representatives will necessarily prove or disprove the cases of the absent class members," we turn to an examination of the proof required in this case.
B. The Law of Medicare.
1. Introduction.
The crucial issue in this case concerns what proof an MAO must present in a private cause-of-action under § 1395y(b)(3)(A) to establish that a no-fault insurer was the primary plan that should have paid or reimbursed payment for a medical bill absent proof of a judgment against or settlement by the primary plan. This issue arises from relatively recent developments in Medicare law. A brief review of the evolution of this law provides helpful background to resolve the issue before us.[2]
2. Development of Medicare Law Leading to this Litigation.
When the Medicare program was enacted in 1965, Medicare paid all covered medical bills even though many beneficiaries had access to other insurance. Over time, Congress became concerned that "[M]edicare has served to relieve private insurers of obligations to pay the costs of medical care in cases where there would otherwise be liability under the private insurance contract." H.R. No. 96-1167, 96th Cong., 2d Sess., reprinted in, 1980 U.S. Code Cong. & Admin. News 5526, 5752.
In 1980, therefore, Congress enacted the Medicare Secondary Payer Act, which required beneficiaries to exhaust other insurance before Medicare would pay. Omnibus Reconciliation Act of 1980, Pub. L. No. 96-499, § 953, 94 Stat. 2599, codified as amended at § 1395y. "Congress's intent was to reposition the burden back to private *643 insurers where it could best be absorbed, especially considering that these insurers had already assumed such burdens-and received the benefits-in contracts with the insured." Manning v. Utilities Mut. Ins. Co., 254 F.3d 387, 396 (2d Cir. 2001).
To implement this requirement, Congress defined such other insurance as a "primary plan" which includes "a group health plan or large group health plan, ... a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance." § 1395y(b)(2)(A). Congress then prohibited Medicare from making payments when payment was available under a primary plan. Id. At the same time, it authorized Medicare to make "conditional payments" when the primary plan delayed payment and Medicare could recoup the conditional payment. § 1395y(b)(2)(B)(i).
In a provision sometimes called the "demonstrated responsibility requirement" Congress indicated that a primary plan's responsibility to make payment could be demonstrated by a judgment, payment by the primary plan, "or by other means." § 1395y(b)(2)(B)(i). The Secondary Payer Act also provided the United States a cause of action to recover conditional payments. § 1395y(b)(2)(B)(iii). In this manner, under the Secondary Payer Act, "Medicare benefits became an entitlement of last resort, available only if no private insurer was liable." W. Heritage Ins. Co., 832 F.3d at 1234.
In 1986, Congress added to the Secondary Payer Act the private cause of action at issue in this case. Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, § 9319, 100 Stat. 1874 (1986). See Manning, 254 F.3d at 396-97. As codified, it reads:
There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A).
§ 1395y(b)(3)(A). This provision is uniquely challenging to interpret. If read in a strictly literal manner, the United States Sixth Circuit tactfully noted, "the private cause of action is rendered inoperative." Bio-Med. Applications of Tennessee, Inc. v. Cent. States Se. & Sw. Areas Health & Welfare Fund, 656 F.3d 277, 286 (6th Cir. 2011). The problem arises from the statute's requirement that the primary plan must fail to pay "in accordance with paragraphs (1) and (2)(A)," neither of which expressly concerns a primary plan's responsibility to pay. Id.
Avoiding a construction of the Act that would render it a nullity, however, the Sixth Circuit has suggested "a primary plan is liable under the private cause of action when it discriminates against planholders on the basis of their Medicare eligibility and therefore causes Medicare to step in and (temporarily) foot the bill." Id. Similarly, the Eleventh Circuit has resolved the ambiguity of the private cause of action by holding that the "demonstrated responsibility requirement" of § 1395y(b)(2)(B)(i) quoted above, although not part of "paragraphs (1) and (2)(A)" referenced in the text, is incorporated into the provision creating the private cause of action. Allstate, 835 F.3d at 1359.
In 1997, Congress enacted part C of Medicare which authorized Medicare Advantage Organizations, the type of organization for which MSPA is the alleged assignee. The Balanced Budget Act of 1997, Pub. L. 105-33, codified as amended at 42 U.S.C. § 1395w-21, etseq. An MAO is a *644 private, for-profit company that contracts with Medicare to provide Medicare coverage based on a flat rate per enrollee. It makes or loses money to the extent it succeeds in providing the required coverage at costs less than the flat rate. Id.
The final development in Medicare law relevant to this appeal is the advent of MAO's filing private causes of action under § 1395y(b)(3)(A) against primary plans. In 2012, the Third Circuit rejected prior precedent and recognized such a cause of action. In re Avandia Mktg., Sales Practices & Prod. Liab. Litig., 685 F.3d 353, 355 (3d Cir. 2012). In 2016, the Eleventh Circuit followed suit. W. Heritage Ins. Co., 832 F.3d at 1232. An MAO's access to the private cause of action, however, does not appear to be settled in light of several forceful and well-reasoned dissents.[3]
3. MSPA Must Prove Bills are Due Under Florida No-Fault Law.
Based upon the statutory regime just reviewed, we cannot accept the argument that MSPA's reimbursement rights are "automatic" and "are not governed by Florida law relating to the recovery of benefits under a PIP policy." Contrary to MSPA's arguments, the Secondary Payer Act does not eliminate the terms and conditions of underlying State no fault law. Under the Secondary Payer Act, "Medicare does not pay until the beneficiary has exhausted his or her remedies under no-fault insurance." 42 C.F.R. § 411.51 (emphasis added).
As this language indicates, the Secondary Payer Act does not supersede an existing State insurance policy: it merely requires the exhaustion of the benefits under that policy. Except for making Medicare the secondary payer and private insurance the primary payer, the Secondary Payer Act "has never created or extended coverage; it has only dictated the order of payment when Medicare beneficiaries already have alternate sources of payment for health care." Blue Cross & Blue Shield of Texas, Inc. v. Shalala, 995 F.2d 70, 73 (5th Cir. 1993).
Indeed, the private cause of action under § 1395y(b)(3)(A) does not arise until Medicare makes a conditional payment when payment "can reasonably be expected to be made ... under no fault insurance." § 1395y(b)(2)(B)(ii). A payment "can reasonably be expected to be made" only when the applicable no fault policies and statutes require the payments. Thus, for each reimbursement it claims, MSPA must demonstrate that, not only did it make a proper conditional payment under Medicare law, but also that Ocean Harbor was required to make the payment in the first instance under Florida no-fault law.
The two cases primarily relied upon by MSPA do not support a contrary conclusion. In both cases, the MAO demonstrated the primary plan's responsibility to make the payment as required by § 1395y(b)(2)(B)(i) by reference to the primary plan's preexisting settlement of a claim relating to the tort which lead to the medical bills at issue. In In re Avandia Mktg., 685 F.3d at 355, Glaxo had reached an omnibus settlement of claims regarding the drug in which it set aside reserves to reimburse the Medicare Trust Fund. But it declined to make payments to the MAO. Id. There, the Third Circuit held that an *645 MAO could file a private cause of action to participate in such preexisting tort settlements. Id.
Similarly, in Western Heritage, the MAO made conditional payments to one of its enrollees who was injured in an accident at a condominium insured by Western Heritage. 832 F.3d at 1232. Meanwhile, on behalf of its insured, Western Heritage settled the tort case and placed in trust the amount of the $19,155.41 for the medical bills. Id. The Eleventh Circuit upheld a judgment for the MAO based upon that preexisting settlement. Id.
Here, in contrast, MSPA does not intend to demonstrate Ocean Harbor's responsibility as a primary plan by means of a preexisting settlement involving Ocean Harbor. Instead, it intends to make that demonstration "by other means," namely Ocean Harbor's responsibility as established by Florida no-fault statutes and policies. For this reason, this case falls squarely outside the holdings of those two cases and squarely in the ambit of Allstate, 835 F.3d at 1361.
In Allstate, the Eleventh Circuit held that even without a settlement or payment by the primary plan, proof of the primary plan's "contractual obligation may serve as sufficient demonstration of responsibility for payment." Id. In so holding, the court made clear that an MAO must still carry the "burden to allege in their complaints, and then subsequently prove with evidence, that Defendants' valid insurance contracts actually render Defendants responsible for primary payment of the expenses Plaintiffs seek to recover. And Defendants may still assert any valid contract defense in arguing against their liability." Id. MSPA's position cannot be reconciled with Allstate.
4. Florida No-Fault Law is Not Preempted.
MSPA counters with several arguments. First, it contends that the Secondary Payer Act preempted most of Florida's no-fault laws through § 1395y(b)(3)(A). This reflects a fundamental misunderstanding of the Secondary Payer Act.
The Secondary Payer Act was never intended to broadly preempt State insurance law. To the contrary, "[w]hether a compensation carrier has a 'responsibility to make payment' with respect to an item or service is generally a matter of state law." See Ins. Guarantee Ass'n v. Burwell, 227 F. Supp. 3d 1101, 1113 (C.D. Cal. 2017) ("The Court is also unconvinced that CIGA has a 'responsibility to make payment' for a treatment not covered by its policy."). Thus, the Secondary Payer Act envisions the full enforcement of state insurance law, particularly full payments under State laws - but only when the conditions of those state insurance laws are met, subject to the condition that Medicare is secondary. See, e.g., Allstate, 835 F.3d at 1361.
Caldera v. Ins. Co. of the State of Pennsylvania, 716 F.3d 861, 867 (5th Cir. 2013), provides an example of how the Secondary Payer Act is based upon a "harmonious relationship with state [insurance] law." Id. at 864. In Caldera, a worker qualified for worker's compensation under Texas law sued his worker's compensation carrier for double damages under § 1395y(b)(3)(A)'s private cause of action. He claimed the cost of surgeries relating to a compensable accident. Texas law, however, imposed a requirement of preauthorization for major surgeries. The worker failed to obtain preauthorization. He contended federal law preempted that state law requirement when the claim was brought under § 1395y(b)(3)(A)'s private cause of action.
The Caldera court rejected this argument. It held that Congress never "intend[ed] to override a primary payer's *646 ability to impose medical necessity requirements in accordance with state law." Id. at 867. Thus, "if a claimant fails to file a proper claim in accordance with state-law requirements and, therefore, cannot recover benefits from the primary payer, ... the claimant cannot succeed under [the Secondary Payer Act]." Id. Medicare is not left without remedies: it "can refuse to make a conditional payment, or it can seek reimbursement from the claimant himself." Id.
Also expressly contrary to MSPA's preemption argument is Western Heritage, which held that a primary plan " 'fails to provide for primary payment (or appropriate reimbursement)' [thus triggering the private cause of action] when it fails to honor the underlying statutory or contractual obligation." Id. at 1237 (quoting § 1395y(b)(3)(A) ) (emphasis added). This language recognizes that an MAO pursuing a claim against an insurance carrier must demonstrate that the carrier "fail[ed] to honor the underlying statutory or contractual obligation." 832 F.3d at 1237.
5. 42 C.F.R. § 411.24(f) is Invalid.
MSPA next cites 42 C.F.R. § 411.24(f) in support of its broad preemption argument. 42 C.F.R. § 411.24(f) provides that Medicare "may recover without regard to any claims filing requirements that the insurance program or plan imposes on the beneficiary or other claimant such as a time limit for filing a claim or a time limit for notifying the plan or program about the need for or receipt of services." Initially, we note that, at best, this regulation would excuse MSPA from compliance with State claims filing requirements - not the substantive law governing no-fault claims such as relatedness to a covered accident, reasonableness, deductibles, and policy limits.
More importantly, however, § 411.24(f) was declared invalid in Health Ins. Ass'n of America, Inc. v. Shalala, 23 F.3d 412, 425. In Shalala, an insurance association claimed § 411.24(f) exceeded the statutory authority delegated to Medicare. After reviewing the controlling statutes, the court agreed 411.24(f) was void. Noting that the cause of action for direct recovery is premised upon the determination that a primary plan "has or had a responsibility to make payment," § 1395y(2)(B)(ii), the court reasoned that this criteria would not be satisfied "[i]f the beneficiary and provider have already missed the filing deadline by the time Medicare makes its payment." Id. at 419. Accordingly, the court held, " 42 CFR § 411.24(f)... go[es] beyond the Secretary's statutory authority and hence [is] invalid." Id. at 425.
6. Ocean Harbor did not Fail to Exhaust Administrative Remedies Regarding Florida No-Fault law.
Finally, MSPA contends that Ocean Harbor failed to exhaust available administrative remedies. MSPA argues that it made an "organization determination" that Ocean Harbor had the responsibility to make payments and that Ocean Harbor could have challenged these determinations pursuant to 42 C.F.R. § 422.566, etseq. We reject this argument for two reasons. First, we were unable to find in this record examples of when and where MSPA made administratively appealable "organization determinations" that Ocean Harbor had the responsibility to make specified payments. More importantly, we find nothing in the cited regulations that creates a federal administrative remedy for a primary plan like Ocean Harbor to challenge such an "organization determination."
The regulations cited by MSPA deal only with claims by an enrollee against an MAO. 42 C.F.R. § 422.566. As used in these regulations, the list of "organization *647 determinations" is limited to instances where the MAO paid or denied an enrollee's or an enrollee's provider's request for Medicare payments. Id. Moreover, only enrollees, providers furnishing services to enrollees, or enrollee's estates can request an organization determination. Id. Nowhere is a primary plan given the right to request a determination regarding its responsibility to make a particular payment or the right to seek administrative review of such a determination.
In 2012, in fact, Congress created a "right of appeal for secondary payer determinations relating to ... no fault insurance" - the exact type of right to administrative appeal MSPA claims was available to Ocean Harbor. In doing so, however, Congress excluded MAO's. Instead, Congress made the administrative remedy available only to decisions made by the Secretary and "for which the Secretary is seeking to recover conditional payments from an applicable plan ... that is a primary plan ...." The Strengthening Medicare And Repaying Taxpayers Act of 2012, P.L. 112-242, section 201 (viii) (2012) (codified as amended at 42 U.S.C. § 1395y(b)(2)(B)(viii) ) ("the SMART Act").
Like the SMART Act itself, the regulations promulgated under the SMART Act apply only to determinations by the Secretary under Medicare Parts A and B and not to determinations by MAO's under Medicare Part C. 42 C.F.R. § 405.900 ("This subpart establishes the requirements for appeals of initial determinations for benefits under Part A or Part B of Medicare."). During the notice and comment period for the regulations, various commenters requested the regulations be made applicable to Secondary Payer actions by MAO's created by Part C, but the Secretary declined: "This request is outside of the scope of this rule. The SMART Act amended only the MSP [Medicare Secondary Payer] provisions for Medicare Part A and Part B." Fed. Reg. 80, 39 sec. II.B., 8 at 10616 (Friday, Feb. 27, 2015) (codified at 42 C.F.R. § 405). Indeed, referring to the regulations that existed prior to the adoption of regulations pursuant to the SMART Act, the Secretary noted that "[u]nder our existing regulations under part 405 subpart I, beneficiaries have formal appeal rights; applicable plans do not have such rights." Fed. Reg. 80, 39, at 10613.
Thus, we see nothing in these regulations whereby a primary plan like Ocean Harbor could administratively contest a determination by MSPA that Ocean Harbor was responsible to make a particular payment. The cases cited by MSPA in support of its argument are inapposite. They concern the requirement that a Medicare enrollee exhaust administrative remedies before suing Medicare in federal court.[4] None of those cases stand for the proposition that a primary plan had to exhaust administrative remedies before defending a claim that it was the responsible primary plan for a medical bill.
*648 For these reasons, we reject the notion that MSPA claims "reimbursement rights are not governed by Florida law relating to the recovery of benefits under a PIP policy" and are therefore "automatic" under § 1395y(b)(3)(A). Instead, MSPA must demonstrate that, in addition to any requirements of federal law, Ocean Harbor was required to make the payment in the first instance under Florida no-fault law for each reimbursement it claims.
7. Florida No-Fault Law.
In its no-fault law, Florida has gone to great lengths to craft a statutory structure that protects both the insured and insurer in a process that promotes accurate and expedited payments of medical bills and lost income up to a statutory amount to covered persons. Substantively, Florida law provides that claims under No-Fault policies "are due and payable as loss accrues upon receipt of reasonable proof of such loss." § 627.736(4), Fla. Stat. It authorizes an insurer to decline payment or reduce payment if "the claim was unrelated, was not medically necessary, or was unreasonable or that the amount of the charge was in excess of [certain statutory limits and schedules]." Id. It allows exclusions from coverage for certain injuries, including injuries that were intentionally self-inflicted, incurred during the commission of a felony, or incurred while operating a vehicle without the owner's permission. Id. § 627.736(4), Fla. Stat.
Procedurally, Florida law mandates that a demand letter to be sent to the insurer as a condition precedent to litigation. § 627.736(6) & (7), Fla. Stat. It provides that payments are overdue if not paid within 30 days of written notice of the circumstances and amount of a covered loss, but allows an insurer to decline to pay all or part of a claim subject to the insurer specifying in writing what and why it is declining to pay. § 627.736(4), Fla. Stat. It allows insurers to require written notice of a loss as soon as practicable. Id. It requires providers to submit claims on certain forms with certain attestations signed by the provider and the insured. Id. It authorizes the insurer to obtain copies of relevant medical records and to require a mental or physical examination of an insured by physicians. Id.
In terms of remedies, Florida law provides civil actions for penalties against an insurer who fails to timely pay valid claims and against an insured who commits insurance fraud. § 627.736(12), Fla. Stat. It makes its payments primary to Medicare and requires an insurer to repay the full amount to a Medicare program "within 30 days after receiving notice that the Medicare program paid such benefits." § 627.736(4), Fla. Stat. Thus, payment under Florida no-fault law proceeds on a factually intensive bill-by-bill and case-by-case basis. Under its theory, MSPA will have to prove Ocean Harbor was required to pay each particular bill and Ocean Harbor will be entitled to raise any appropriate defense under the statute and policies.
III. CONCLUSION
This case does not involve a situation in which MSPA's proof of its own claim "necessarily proves the cases of the other class members." Sosa, 73 So.3d at 112 (internal citation omitted). Proof that certain medical bills paid by MSPA's alleged assignor should have been paid by Ocean Harbor as a primary payer will not establish that other medical bills paid by a different MAO should also have been paid by Ocean Harbor as a primary payer. To the contrary, proof to establish liability will necessarily devolve into a series of mini-trials under Florida no-fault law, § 627.736, etseq., Fla. Stat., which precludes a finding of predominance and renders this case inappropriate for class action treatment. Accordingly, *649 we reverse the provisions of the certification order under review in conflict with this opinion. The remainder of the order is quashed without prejudice.
REVERSED and REMANDED for further proceedings consistent with this opinion.

The Florida term for no-fault insurance is "personal injury protection" ("PIP"). See § 627.736, etseq., Fla. Stat. Since the Medicare statutes at issue use the term "no-fault," that term will be used in this opinion.

Interpreting the Medicare statutes can be challenging. Courts have called the Medicare statutes "remarkably abstruse," MSP Recovery, LLC v. Allstate Ins. Co., 835 F.3d 1351, 1358 (11th Cir. 2016), if not "one of the most completely impenetrable texts within the human experience." Humana Med. Plan, Inc. v. Reale, 180 So.3d 195, 199 (Fla. 3d DCA 2015) (quoting Parra v. PacifiCare of Arizona, Inc., 715 F.3d 1146, 1149 (9th Cir.2013). See also In re Avandia Mktg., Sales Practices & Prod. Liab. Litig., 685 F.3d 353, 365 (3d Cir. 2012) (noting "a declaration that the language of the Medicare Act is clear may be counterintuitive.").

Humana Med. Plan, Inc. v. W. Heritage Ins. Co., 880 F.3d 1284, 1300 (11th Cir. 2018) (Tjoflat, J. dissenting); W. Heritage Ins. Co., 832 F.3d at 1240 (Pryor, J. dissenting); see Jennifer Jordan, Is Medicare Advantage Entitled to Bring a Private Cause of Action Under the Medicare Secondary Payer Act?, 41 Wm. Mitchell L. Rev. 1408, 1417 (2015). Because the issue is not before us, we assume but do not decide that an MAO has a private cause of action under § 1395y(b)(2)(B)(i) against a primary plan.

See Reale, 180 So.3d at 205 ("Because the [enrollees] did not obtain a final decision from the Secretary, as required by § 405(g), their dispute is not subject to judicial review."); see also Potts v. Rawlings Co., LLC, 897 F.Supp.2d 185, 199 (S.D.N.Y. 2012) (ruling that court lacked subject matter jurisdiction because enrollees "were obligated to exhaust their administrative remedies before bringing this action.");W. Heritage Ins. Co., 832 F.3d at 1240 ("Before Western settled with the Reales, Humana issued to Ms. Reale an Organization Determination for $19,155.41. Ms. Reale was entitled to administratively appeal that amount but did not. See 42 U.S.C. § 1395w-22(g). The amount that Humana may recover is therefore fixed, at least as to Ms. Reale." This was true "[e]ven if Western retains the right to dispute the amount.").